**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RICHARD CALVIN on Behalf of Himself and All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | <u>DEMAND FOR JURY TRIAL</u> |
| DENTSPLY SIRONA INC., DONALD M. CASEY, JR., JOHN P. GROETELAARS, SIMON D. CAMPION, GLENN COLEMAN, and ANDREAS G. FRANK, | |
| Defendants. | |

**COMPLAINT FOR VIOLATIONS OF THE**
**<u>FEDERAL SECURITIES LAWS</u>**

Plaintiff Richard Calvin ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Dentsply Sirona Inc. ("Dentsply" or the "Company"), with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Dentsply; and (c) review of other publicly available information concerning Dentsply.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal securities class action on behalf of all persons and entities that purchased Dentsply common stock between February 28, 2022, and November 6, 2024, inclusive (the "Class Period") against Dentsply and certain of its officers and executives, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Dentsply, purportedly the world's largest manufacturer of professional dental products and technologies, develops, manufactures, and markets dental equipment, dental products and healthcare consumable products.  On December 31, 2020, Dentsply acquired Byte, a direct-to-consumer ("DTC") aligner solution.  Throughout the Class Period, Dentsply touted the benefits of the Byte acquisition, the positive integration of Byte aligners into the Company's digital strategy, and the increasing demand for Byte aligners—particularly in underserved populations.

3.      Unbeknownst to investors, before and during the Class Period, Dentsply targeted low-income people with underlying dental issues that were ineligible for more traditional aligner treatment, Dentsply sold Byte aligners to contraindicated patients, and Dentsply knew that its Byte aligners were causing severe patient injuries.  Ultimately, Dentsply's Byte patient onboarding

workflow did not provide adequate assurance that contraindicated patients did not enter treatment, and Dentsply materially overstated the goodwill value of Byte.

4.       As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

5.       The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

6.       This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

7.       Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's common stock that is the subject of this action listed on the NASDAQ, a national securities exchange.  Therefore, the alleged illegal conduct was carried out, in part, in this Judicial District.

8.       In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone and wire communications, and the facilities of a national securities exchange.

## PARTIES

9.     Plaintiff Richard Calvin, as set forth in the accompanying certification, incorporated by reference herein, purchased Dentsply common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

10.     Defendant Dentsply is incorporated under the laws of Delaware with its principal executive offices in Charlotte, North Carolina.  Dentsply's common stock trades on the NASDAQ under the ticker symbol "XRAY."

11.     Defendant Donald M. Casey, Jr. ("CEO Casey") served as Dentsply's Chief Executive Officer ("CEO") from February 2018 until his termination on April 19, 2022.

12.     Defendant John P. Groetelaars ("Interim CEO Groetelaars") served as Dentsply's Interim CEO between April 19, 2022, and September 12, 2022.

13.     Defendant Simon D. Campion ("CEO Campion") has served as Dentsply's CEO, President, and Director since September 12, 2022.

14.     Defendant Glenn Coleman ("CFO Coleman") served as Dentsply's Chief Financial Officer ("CFO") and Executive Vice President from September 2022 until his resignation on November 7, 2024.

15.     Defendant Andreas G. Frank ("CBO Frank") has served Dentsply's Chief Business Officer ("CBO") and Executive Vice President since April 2023.  CBO Frank joined Dentsply in April 2022.

16.     Defendants CEO Casey, Interim CEO Groetelaars, CEO Campion, CFO Coleman, and CBO Frank (together, the "Individual Defendants" and together with the Company, "Defendants") because of their positions with Dentsply, possessed the power and authority to control the contents of, among other things, Dentsply quarterly reports, press releases, and

presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of Dentsply's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

17.    Dentsply's four reportable segments are: Connected Technology Solutions, Essential Dental Solutions, Wellspect Healthcare, and Orthodontic and Implant Solutions, which includes SureSmile, an aligner solution provided through clinician offices, and Byte, a DTC aligner solution.  In 2023, Orthodontic and Implant Solutions comprised more than 26 percent of Dentsply's net sales by segment and nearly 19 percent of its segment adjusted operating income.

18.    Before the start of the Class Period, on December 31, 2020, Dentsply closed its acquisition of Byte in a $1.04 billion all-cash transaction.  According to Dentsply, Byte manufactured affordable, "doctor-directed," DTC clear dental aligners and held "a leadership position in the rapidly growing direct-to-consumer, doctor-directed clear aligner market."

19.    On January 4, 2021, Dentsply issued a press release announcing the acquisition. Therein, Dentsply touted that the Byte acquisition "[e]nhances scale in the important clear aligner space[,]" "[a]ccelerates the growth and profitability of Dentsply Sirona's combined clear aligners business[,]" and was "[a]ccretive to Dentsply Sirona's long-term financial targets and Non-GAAP EPS in 2021."  Dentsply further explained that, priced "[a]t under $85 per month, Byte has found

a way to make the inaccessible, accessible—providing an easy, convenient and affordable way to upgrade your smile through the Byte Teledentistry platform."

20.     The press release also told investors Byte "is immediately accretive to Dentsply Sirona's revenue growth rate and non-GAAP EPS."  Then-CEO Donald M. Casey, Jr. is quoted in the press release, stating, "[w]e look forward to working with the talented team at Byte as we utilize our collective strengths to expand patient access to quality care and support the success of our dental partners around the world."

21.     Byte aligners are subject to a multifaceted regulatory framework.  As Dentsply explained in SEC filings before, during, and after the Class Period: "[d]ue in part to its direct-to-consumer model, the Company's Byte aligner business in the United States is subject to various state laws, rules and policies which govern the practice of dentistry within such state."  Dentsply assured investors that "Byte contracts with an expansive nationwide network of independent licensed dentists and orthodontists for the provision of clinical services, including the oversight and control of each customer's clinical treatment in order to comply with these regulations and ensure that the business does not violate rules pertaining to the corporate practice of dentistry."

22.     By the end of 2021, Dentsply made clear that its clear aligners business—and Byte in particular—was crucial to the Company's expansion of its digital capabilities.  For example, during the Company's presentation at the 4th Annual Evercore ISI HealthCONx Virtual Conference, CEO Casey stated:

> The Dentsply Sirona Clear aligner franchise now has considerable bulk, which allows us, in my opinion, to operate at scale in critical areas that are not necessarily customer-facing.
>
> So in essence, we really believe that protect -- to protect and expand our digital leadership footprint we have to have scaled assets, so we believe that Byte was an important part of scale.  Now if you go specifically into Byte a couple of points. The first is Byte is performing ahead of what the business plan that we put together to do the acquisition internally.

. . .

The last issue and some of the stuff we're working on internally that we think is going to benefit not just Byte, but SureSmile as well as other things that we're doing in the dentist office.

They're building out patient experience apps that are going to be really relevant as the dentist looks to interact with patients and that one of the things I think, aligned us extremely well. They drive traffic to [the] dentist office. So as we begin to look at some of the patient-facing capabilities that we bought with Byte. Again, we thought it was just -- we thought it was and believe even more firmly a year later that this was an important strategic acquisition for us.

23.    Throughout the Class Period, Dentsply touted the benefits of the Byte acquisition, the positive integration of Byte aligners into the Company's digital strategy, and the increasing demand for Byte aligners—particularly in underserved populations.

## FALSE AND MISLEADING STATEMENTS

24.    On February 28, 2022, the start of the Class Period, Dentsply hosted an earnings call associated with the release of its 4Q21 financial results. During the call, CEO Casey trumpeted the strong demand for the Company's digital dentistry products, which he attributed to the clear aligner products, such as Byte:

I'd like now to outline progress in each of these areas, starting with digital dentistry . . . Our higher-end CBCT imaging systems also saw robust demand. This stems from dentists looking to add more sophisticated diagnostic tools that will allow them to incorporate more complex procedures like implants and clear aligners to the[ir] practices.

25.    During the same call, CEO Casey also stated that the Byte acquisition "provided important scale to our clear aligner business." In fact, CEO Casey said that "[c]lear aligners are an essential part of our digital strategy and increase our exposure to one of the fastest-growing areas in dentistry."

26.    On May 10, 2022, the Company hosted earnings call to discuss the release of its 1Q22 financial results. During the call, Interim CEO Groetlaars emphasized the benefits and

interconnectedness of clear aligners, such as Byte, and the Company's ongoing digital dentistry strategy:

> [W]hether it's implants or aligners, we think that the digital dentistry vision and strategy that we're pursuing actually makes a dentist's office more efficient and more productive. And that trend towards digital dentistry and the workflows that go with it, including aligners and implants and other restorations, I think will help offset some of that inflationary pressure.

27.    On November 14, 2022, the Company hosted an earnings call associated with the release of its 3Q22 financial results. During the earnings call, CEO Campion assured investors that Byte would remain in the Company's portfolio and continue to do well, in part due to the Company's digital strategy:

> [W]e think Byte has a key role in our portfolio moving forward. We are end-to-end on the digital or on the consumable and digital scale, and we think we should be end-to-end on the consumer spectrum as well.

> So we think there's a future for Byte. The aligner business has delivered double-digit growth for us. We feel we can do better with it for sure. We're investing behind it to make it easier to do business with and get more conversions out of that business. But for sure, for now, Byte remains a key part of our business, and w[i]ll continue to be so for the foreseeable future.

28.    On December 1, 2022, the Company presented at the Evercore ISI HealthCONx Conference. During the presentation, CEO Campion touted the Byte business, stating, "we think that Byte can be an integral and important part of our portfolio moving forward . . . [A]s we move into 2023, it is a key focus for management and the team that runs Byte and SureSmile to ensure we get more value out of that particular part of our business."

29.    During the same conference, CFO Coleman highlighted, "I think we've seen really strong sequential growth in different parts of our aligner business both Byte and SureSmile year-over-year. . . . I think the key for us, though, is – the revenue opportunity is clearly there. But Simon's point, is it an underpenetrated market, probably the fastest-growing area of dental as we know. And so our intent is to continue to be a key player here."

30.    On January 11, 2023, during the J.P. Morgan Healthcare Conference, the Company emphasized the accelerating performance of its orthodontics business.  For example, CFO Coleman stated, "[T]he real outlier, I would say, from a positive perspective was the Ortho business.  So between SureSmile and Byte, which is our direct-to-consumer clear aligner business, so really strong performance in both of those businesses.  And so our ortho business clearly put up some really strong year-over-year growth."

31.    Later during the conference, an analyst asked about Byte customer acquisition costs, "how that's trending[,]" how Dentsply thinks about "spend across different geographic markets[,]" and whether the Company had "found ways to reduce those said costs?"  CFO Coleman responded:

> So we want to make sure we're taking actions to improve profitability in the Byte business.  Customer acquisition cost is one of those areas, so reducing customer acquisition costs.  A big part of that is also improving our conversion cost.  So when we send out an impression kit to a customer, once they get that impression kit and actually getting to an actual sale and a clear aligner, that conversion rate has to go higher than it is today.  And so that's one of the actions that we're taking to drive better performance, and that will help the overall margin situation.

> The financing costs are also extremely high for this type of customer demographic.  And so we're taking actions to do a better job around how to lower our financing costs in the areas that are supporting customers that don't typically go to a dentist.  These are customers that are lower income customers.  And so we're doing a better job, I think, of managing our risk around the customer base.

32.    Responding to the same question, CBO Frank added:

> I think a key element here is patient compliance and patient experience.  And so we have launched, over the course of the last 12 months, our new Byte app that drives significantly closer engagement with the patients throughout their treatment, leads to higher compliance, leads to higher Net Promoter Scores that we can track and measure as one of our KPIs.  In addition to that, there's opportunity on the workflow side with a more hybrid model to involve clinicians, to digitize some of the impression-taking and further help with the conversion to the treatment plant and the conversion metrics that drive efficiency.

33.     On February 28, 2023, Dentsply hosted an earnings call associated with the release

of its 4Q22 and FY22 financial results.  During the call, Dentsply continued to emphasize the

strong growth of Byte and the rest of its aligners business.  For example, CFO Coleman stated:

> Aligners grew over 25% in the fourth quarter, driven by strong growth in both
> SureSmile and Byte.  This quarter was the second quarter in a row with double-
> digit growth in this part of our business. . . Our direct-to-consumer aligner brand,
> Byte also saw a very strong growth despite slowing consumer spending trends as
> we're seeing improvement in customer conversion rates.

34.     Later in the presentation, an analyst asked Dentsply to comment on its "longer-

term . . . clear aligner strategy."  CEO Campion responded:

> So Byte has performed very well for us over the past 2 quarters. . . .  It has performed
> very well since we've arrived here.  We have had great customer satisfaction scores
> through the My Byte app, which is really resonating with them, and it's performing
> well.  So we see it as a as a meaningful part of our portfolio, one that we're being
> diligent around expenses on [sic] and investing appropriately and driving customer
> acquisition, customer conversion and trying to increase customer satisfaction scores
> and drive the web traffic in that manner.

35.     On May 3, 2023, Dentsply hosted an earnings call associated with the release of its

1Q23 financial results.  During the call, CEO Campion touted, "Byte not only delivered top line

growth, but also made significant strides on improving operational performance."  In response to

an analyst question about the "real drivers" of "aligner profitability," CFO Coleman explained,

"Relative to the Aligner profitability, I think the key around this is our Byte business.  And the

most important thing is really looking at the quality of the funnel and how we're targeting

customers.  And we're seeing an increase in our overall customer conversion rates, which really

helped to reduce customer acquisition costs and drive increased profitability."

36.     Later on the call, another analyst asked for additional color about where Dentsply

was "seeing the most success" in its aligners business.  CFO Coleman explained, as follows:

> On the Byte side, I think we're doing a much better job of targeting customers and
> driving better customer conversion rates that I mentioned earlier.  And we've also
> rolled out HyperByte, which is helping speed of treatment for customers on the

direct-to- consumer side.  So on the whole, we are capturing more market share in both direct-to-consumer and the GP space.  And obviously, this is still an underpenetrated market in one of the fastest-growing areas because aesthetics are still a very fast-growing area in the dental space.

37.    On June 14, 2023, Dentsply continued to tout its Byte business during the Goldman Sachs Global Healthcare Conference.  For example, CFO Coleman stated that "we're really excited about SureSmile and equally excited about Byte, our direct-to-consumer business, which has done exceptionally well."  CFO Coleman also commented on the market for Byte DTC aligners in particular:

> So lots of opportunities for us, including bringing down our financing costs, which has been an issue for the Byte business, given the profile of the customer there, which is lower income, more risk around not getting paid.  And so we've done things around that as well to bring that cost down.  So all things heading in the right direction.

38.    On September 12, 2023, Dentsply presented at the Baird Global Healthcare Conference.  During the conference, Dentsply continued to trumpet the strength of its aligners business.  For example, when asked about Byte and SureSmile "outperform[ing] expectations the last couple of quarters" in the U.S. and whether that was sustainable, CEO Campion responded, "So just in North America, great success on SureSmile and indeed Byte.  Byte makes up probably 55-or-so percent of our ortho business, really robust growth in Europe. . . .  [W]e think the direct-to-consumer business is very attractive for us.  [I]t's profitable for us right now, albeit dilutive for now to Dentsply Sirona."

39.    During the earnings call associated with the release of the Company's 3Q23 financial results on November 2, 2023, CFO Coleman continued to highlight Dentsply's aligners business: "Shifting to Orthodontic & Implant Solutions segment, organic sales grew 3.7%.  Aligners grew double digits for the fifth consecutive quarter.  This strong performance was driven

by growth in both SureSmile and Byte . . . Our direct-to-consumer aligner brand Byte grew 7% as

we saw higher customer conversion rates."

40.    Dentsply also warned that it expected a growth slowdown for its aligners business.

For example, in response to a question concerning 4Q23 projections, CFO Coleman noted, "So in

orthodontics, we're projecting to have low single-digit growth or single-digit growth.  Obviously,

that's a slowdown from what we saw the past 5 quarters."  CFO Coleman attributed the slowdown

to "a combination of the macro environment for SureSmile and also Byte and some likely pressures

we're going to see with the student loan repayments being put back in place."

41.    During Dentsply's November 9, 2023 Investor Day, Defendants discussed the

"target demographics" for Byte.  For example, CBO Frank commented:

> Moving to orthodontics.  Our solutions are focused on aligner treatment.  We serve
> the professional segment with SureSmile with its proprietary treatment planning
> algorithms that allow us to reduce the number of refinements needed.  We also
> provide direct-to- consumer offerings through Byte.  We see these solutions as
> complementary, serving different patient demographics.  The Byte at home solution
> expands the reach for aligner treatment directly to patients, many of whom do not
> have an established relationship with a dentist and thereby growing the overall
> market.  As you can see from the market share data, we have a lot of runway to
> continue to expand globally and further penetrate the existing categories.

42.    CBO Frank added:

> Our goal here is to show patients the potential treatment benefits and drive
> improved treatment acceptance rates.  In turn, our Byte business has changed its
> marketing strategy to focus on specific target demographics, which has resulted in
> more than 20% higher customer conversion rates year-to-date versus last year.  We
> are also expanding our offering to our existing loyal customer and patient base with
> ancillary products and services, including at home and professional dental care,
> such as retainers, whitening and preventive care.  These opportunities have the
> potential to significantly increase the lifetime value of our aligner customers.

43.    Dentsply also assured investors that Byte is profitable and, in light of a competitor

leaving the market, Dentsply would increase its aligners market share.  For example, in response

to a question about profitability, CFO Coleman explained:

I know there's questions about the profitability of the business given another competitor in the space is having challenges. Our business is profitable. But we see more opportunity. We've already moved the manufacturing to a common plant with SureSmile and Byte, so that's already completed. But for us, it's really about increasing those customer conversion rates. And we feel very confident. Just given some of the competitive dynamics, we may actually see that go up for us.

44.    Later during the call, CFO Coleman emphasized that Byte's strong growth will allow Dentsply to fully capitalize on the new opening in the competitive space:

So I would say, first and foremost, we have been taking share in the direct-to-consumer space. And we have been growing very nicely if you look at the results for Byte over the last 4 or 5 quarters. . . . And listen, we do think we can take advantage of the competitive situation that's going on in the space. There's a competitor that has $300 million of revenue that potentially will be up for grabs. And so we're going to go after that hard.

45.    CBO Frank elaborated on CFO Coleman's explanation of Dentsply's "bridge" to achieve its target of $3 per share adjusted EPS in 2026:

I think the other piece is, I think that bridge also contemplates the investments we are making, including raising the bar in quality, in ethics and compliance. And I think in particular, quality is something that I think we take very personally. We have a quality policy. It says quality begins with me. And it is a really important part of how we see our position in the market and what we stand for at Dentsply Sirona and what we commit to for our patients and for our customers.

46.    On January 10, 2024, Dentsply presented at the J.P. Morgan Healthcare Conference. During the presentation, Dentsply assured investors that it would continue to grow its clear aligners business given the exit of a large competitor from the market. For example, CFO Coleman stated:

[I]f you look at the orthodontic market, clear Aligners, we're very confident we can grow double digits and approach that 20% range in a normal macro environment. We've got some tailwinds and favorable dynamics in our direct-to-consumer business with Byte given we've had a large competitor exit that space[.] [O]n the in- office side, we're seeing very positive trends with SureSmile. So in the ortho area, we feel very confident over the long term, we can grow double digits and approach that 20% range.

47.    During the same conference, an analyst asked about the 20% growth guidance:

"And shifting over to that Aligners portion of the portfolio, you're anticipating over 20% growth

between SureSmile and Byte. So can you walk us through, what gives you confidence on these above-market growth targets and how achievable they are?" In response, CBO Frank explained:

> So we have -- with Byte, we have a direct-to-consumer platform. We have focused the last 12 months intently on profitably growing our direct-to-consumer business, focusing on the top of the funnel on our conversion rates, on the financing offerings that we have for consumers. And that positions us really well now to take advantage of this major shift that we're seeing in the category with the leading company exiting the space.

48.     On February 29, 2024, during the earnings call associated with the release of Dentsply's 4Q23 and FY23 financial results, an analyst asked about Dentsply's confidence in Byte growth: "I think the commentary around expectations for 20% plus growth were pretty notable . . . What gives you the confidence that this can be durable given expectations for what seems to be still kind of difficult macro within dental?" CFO Coleman responded:

> I think we're counting on a stable macro environment to hit these numbers. [W]e feel quite good that Byte's going to put up some meaningful growth here in 2024. I would just say that we did see some headwinds on the financing front in the fourth quarter with Bytes but Byte only grew 6% in the fourth quarter, we had some financing constraints. A lot of it was subprime customers. We worked through some of that here in the first quarter as well. . . . But with the investments that we're making now, adding more treatment planners, clinical and sales support people, I feel like we've got a really good path here to generate 20-plus percent growth in Byte in 2024.

49.     On May 15, 2024, Dentsply presented at the Bank of America Health Care Conference. During the presentation, CFO Coleman continued to tout Dentsply's ability to capitalize on a large competitor leaving the market:

> I think our Ortho story is a really good one. If I look at Byte, it's our direct-to-consumer business. We didn't see much of an uptick until one of the big competitors actually exited the market, which was December of last year. And so that created a big opportunity for us. We're not going after all the business they were going after to be clear. So there's probably about 1/3 of that, that's interesting for us, the profitable part of that business.

50.     On July 31, 2024, during the earnings call associated with Dentsply's release of its 2Q24 financial results, CFO Coleman explained that Dentsply had lowered its 2024 Byte growth

target from 20% to 15%: "[d]uring the quarter, legislative changes required us to adjust our go-to-market model in certain states.  Given the evolving legislative and regulatory environment, we now expect Byte to grow approximately 15% for the full year compared to our previous estimate of more than 20% growth."  Nevertheless, CEO Campion reassured investors, stating, "[o]ur ortho business continues to be our fastest-growing portfolio globally notwithstanding the previously mentioned regulatory environment for Byte in the U.S."

51.     Later during the call, an analyst asked about the Byte growth target reduction and legislative changes, asking "where does this go longer term[?]" CEO Campion responded:

> So that legislation varies state to state, but there are some common themes between them all.  We've done a number of things to mitigate that.  Number one, we've invested in government relations or more investment in government relations to help states understand the process of direct-to-consumer aligners.  And then secondarily, we've adjusted our internal processes to facilitate these changes that some states are mandating.  I think the adjustment that you've seen in the growth rates is because of the incremental steps and arguably costs to patients, because they've to take some time out of work to go to the dentist, or do a teledentisry visit.  So it's not a reflection on the product that we provide.  It's a reflection of rather on [sic] the internal steps that these regulations are enforcing or placing on potential customers.

52.     On September 5, 2024, Dentsply presented at the Morgan Stanley Global Healthcare Conference.  During the presentation, CEO Campion reiterated that "we've also moderated our expectations on our aligner business, our Byte in particular, given some of the regulatory challenges that DTC business has surfaced over the past number of months.  So there are some of the headwinds for the back part of the year that we're overcoming and hence, that guidance at the Q2 call."

53.     Soon thereafter, on September 10, 2024, Dentsply attended Baird's Global Healthcare Conference.  In response to a question about demand for Byte in the context of a DTC competitor going "out of business" at the end of 2023, CEO Campion stated:

Yes, I think there's decent demand in that business for sure. We've got the regulatory challenges that we spoke about at the last earnings call that have slowed down some of the conversion rates. To be fair to SmileDirectClub, their government affairs was helping out with respect to trying to mitigate some of those risks. And now it's up to us to invest more in government affairs to do the work ourselves. I think the growth profile is still pretty robust in the direct-to-consumer business. Remember, the median income for those families that go down that route is about $65,000. So it's a different segment of the market. Of course, there is continued pressure on that group. A lot of them finance their aligners with interest rates the way they are and greater sensitivity around credit scores in that group. We are seeing some pressure on the financing side, but the revenue growth is still -- it's certainly still double-digit revenue growth in that space.

54.    On October 25, 2024, before market hours, Dentsply held a special call with investors to discuss Dentsply's recent "Byte business update." Nevertheless, during the same call, CEO Campion maintained that Dentsply "holds itself to the highest standards of quality and compliance, with patient safety at the center of everything we do." CEO Campion claimed:

[W]e continue to believe the potential risk to patients remains low. . . . Turning to what this means for Byte. As we work through this review, we will continue to work closely with the FDA and other regulatory authorities. Throughout this process, we will also focus on continuing to communicate with treating dentists and their patients to support their continued care, as appropriate.

He also claimed, "Independent of the product suspension, there had already been work underway within the Byte business[,]" and "[o]ur goal is to continue to provide access to quality oral care for patients."

55.    Before receiving analysts' questions during the same call, CEO Campion stated:

I want to reiterate that patient safety and customer care is at the heart of all we do, and we remain focused on our mission of transforming dentistry to improve oral health globally while continuing to be transparent with all stakeholders. We will evaluate and assess the appropriate next steps with regard to Byte in coordination with the FDA, with the goal of continuing to provide innovative, high-quality and effective solutions to advance patient care.

56.    During the same call, an analyst asked, "[I]s there anything you've seen from the patients where you've paused or canceled orders in terms of activities they're pursuing?" In response, CEO Campion maintained:

[W]e continue to believe that the potential risk to patients remains low, and we made the decision to voluntarily suspend sales and marketing for the products as -- while we conduct the review.  There have been no changes to the quality, safety and effectiveness of the Byte Aligners and Impression Kits.  And we have not established a causal link between the aligners and impression kits and any reports of serious injuries or adverse results.

57.    Additionally, another analyst asked, "Just at what point does this kind of call into question kind of your commitment to the Byte business from here?" In response, CEO Campion explained,

We are looking at the state regulations for -- that have changed the profile of this business.  We -- while saying that we think that aligners and teledentistry are necessary for -- to connect the underserved patient populations that may not be able to access it.  But we have a lot of work to do over the next several weeks with respect to the lift to drive our technical and regulatory solution to the channels that we currently face.

58.    The above statements set forth above in ¶¶24-57 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading.  Specifically, Defendants failed to disclose that: (1) Dentsply targeted low-income people who did not have access to good oral hygiene education, a dentist, or dental insurance, which often meant patients signing up for Byte had underlying dental issues that would have made them ineligible for treatment; (2) the push for Byte growth and sales commissions caused sales employees to sell to contraindicated patients; (3) as a result, the Byte patient onboarding workflow did not provide adequate assurance that contraindicated patients did not enter treatment; (4) before and during the Class Period, reports of Byte patient injuries were pouring in; (5) Dentsply knew that its Byte aligners were causing severe patient injuries for years but did little to investigate those injuries or notify the FDA; (6) Dentsply had no systems in place to notify the FDA of these injuries, which the Company is required to do within 30 days of learning of a problem; (7) the FDA had received a sharp uptick in reports of serious injuries from Byte

patients; (8) as a result of the above, Dentsply materially overstated the goodwill value of Byte; (9) as a result of the above, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

59.     On October 24, 2024, after markets closed, investors began to learn the truth about Byte when Dentsply issued a stunning press release announcing the "voluntary suspension of sales and marketing of its Byte Aligners and Impression Kits while the Company conducts a review of certain regulatory requirements related to these products." Dentsply noted that its "decision was made in consultation with" the FDA and that, "[i]n connection with this review, . . . the Company has suspended shipment and processing of new and recently placed orders for" Byte.

60.     In the related current report filed with the SEC on Form 8-K on the same day, after markets closed, Dentsply stated the suspension of Byte sales and marketing was taken as a "precautionary measure." The report also revealed that, in connection with the preparation of its 3Q24 financial statements, Dentsply "expects to record non-cash charges for the impairment of goodwill within the range of $450-$550 million" for its Orthodontic and Implant Solutions segment, with the decline in fair value for the Orthodontic Aligner Solutions reporting unit "driven primarily by adverse impacts from recent state regulatory trends pertaining to the Company's direct-to-consumer aligner business."

61.     In the same report, Dentsply explained that it would "evaluate and assess the appropriate next steps," with the purported "goal of continuing to provide access to quality oral care to underserved populations." The report also noted that, in connection with the Byte assessment, "the Company may incur additional impairments and write- offs regarding its Byte business, which may be material in the current and future periods."

62.    On October 25, 2024, before market hours, Dentsply held a special call with investors to discuss Dentsply's recent "Byte business update."  During the call, CEO Campion explained that, "in connection with our ongoing discussions with FDA, we have determined that our patient onboarding workflow may not provide adequate assurance that certain contraindicated patients do not enter treatment with Byte Aligners" and, as a result, "we made the decision to voluntarily suspend sales and marketing for these products as we conduct our review."

63.    UBS analysts highlighted that "XRAY surprises with suspension of Byte sales[,]" with Dentsply announcing it "would voluntarily cease sales and marketing of its direct-to-consumer Byte aligners . . ., a decision made in consultation with the FDA."

64.    As a result of this news, the price of Dentsply stock fell more than 4%, from a closing price of $24.41 per share on October 24, 2024, to a closing price of $23.31 per share on October 25, 2024.

65.    On November 7, 2024, before the markets opened, the market continued to learn the truth about Dentsply's Byte business when Dentsply reported its 3Q24 financial results.  In the related press release announcing the results, Dentsply disclosed that it had "recorded a non-cash charge for the impairment of goodwill of ($495) million net of tax within the Orthodontic and Implant Solutions segment."  The press release also detailed how the decline in fair value was purportedly driven by "sustained macroeconomic pressures, legislative trends impacting Byte, weakened demand and competitive pressures in implants, and lower expected volumes of lab materials."

66.    The press release further disclosed that Dentsply had revised its 2024 outlook, with expected organic sales of "(3.5%) to (2.5%) (previously (1%) to flat)" and adjusted EPS of "$1.82 to $1.86 (previously $1.96 to $2.02)."  Dentsply claimed that its revised 2024 outlook was "due to

18

market pressures impacting U.S. equipment, legislative changes affecting the direct-to-consumer aligner business model, and the voluntary suspension of sales, marketing, and shipments" of Byte.

67.     During the corresponding earnings call held later that day, CEO Campion reported that, although Dentsply was "not at a point in our analysis to make a definitive decision concerning Byte," the Company was "thoroughly evaluating strategic options, which may include a discontinuation of some or all of this business." CFO Coleman explained:

> I just keep in mind the Byte business is having a large impact on our fourth quarter forecast. We've essentially removed all revenue associated with shipments beyond October 24, which is when we initiated the ship hold. And while the revenue is obviously removed, there's still costs in this business that we're working through, right?

68.     Following the release, Evercore analysts described the disclosures as a "[t]ough day. Today's update to both shorter-term dynamics in the channel and the 2025 financial implications from the Byte suspension (which we are assuming will be permanent), have complicated the outlook for XRAY." Similarly, Barrington Research commented, "A final decision has not yet been made regarding the Byte business, but we would speculate that a complete shutdown may be the most likely outcome."

69.     Other analysts highlighted that the Byte sales suspension, and likely discontinuation of the Byte business, were the result of issues specific to Dentsply. For example, Piper Sandler analysts reported on the "company-specific" commercial pressures facing Company. Similarly, Baird analysts reported that, "for XRAY, . . . issues beyond macro remain sizeable" before concluding that "visibility remains as low as we've seen in 20+ years covering this name."

70.     On this news, the price of Dentsply stock fell $6.72 per share, or more than 28%, from a closing price of $23.98 per share on November 6, 2024, to a closing price of $17.26 per share on November 7, 2024, on extraordinary trading volume.

## CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Dentsply common stock between February 28, 2022, and November 6, 2024, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

72.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Dentsply's common stock are actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Dentsply common stock were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Dentsply or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

73.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

74.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

75.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' actions as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Dentsply; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

76.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

77.     The market for Dentsply's common stock was open, well-developed, and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Dentsply's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class, relying upon the integrity of the market price of the Company's securities and market information relating to Dentsply, purchased or otherwise acquired Dentsply's common stock and have been damaged thereby.

78.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Dentsply's common stock, by publicly issuing false and/or misleading

21

statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Dentsply's business, operations, and prospects as alleged herein.

79.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Dentsply's financial well-being and prospects. These material misstatements and/or omissions had the effect of creating, in the market, an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## **LOSS CAUSATION**

80.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

81.    During the Class Period, Plaintiff and the Class purchased Dentsply's common stock at artificially inflated prices and were damaged thereby. The price of the Company's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

82.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Dentsply, their control over, and/or receipt and/or modification of Dentsply's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Dentsply, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

83.     The market for Dentsply's securities was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Dentsply's securities traded at artificially inflated prices during the Class Period.  On March 1, 2022, the Company's share price closed at a Class Period-high of $54.36 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Dentsply's common stock and market information relating to Dentsply, and have been damaged thereby.

84.     During the Class Period, the artificial inflation of Dentsply's common stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or

misleading statements about Dentsply's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Dentsply and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's common stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

85.     At all relevant times, the market for Dentsply's common stock was an efficient market for the following reasons, among others:

(a)     Dentsply common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market.

(b)     As a regulated issuer, Dentsply filed periodic public reports with the SEC and/or the NASDAQ.

(c)     Dentsply regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Dentsply was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

86.     As a result of the foregoing, the market for Dentsply's common stock promptly digested current information regarding Dentsply from all publicly available sources and reflected

such information in Dentsply's common stock price. Under these circumstances, all purchasers of Dentsply's common stock during the Class Period suffered similar injury through their purchase of Dentsply's common stock at artificially inflated prices and a presumption of reliance applies.

87.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

88.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker

had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Dentsply who knew that the statement was false when made.

### FIRST CLAIM

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

89.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

90.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Dentsply's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each defendant, took the actions set forth herein.

91.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Dentsply's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein, or as controlling persons as alleged below.

92.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails and wires, engaged and participated

in a continuous course of conduct to conceal adverse material information about Dentsply's financial well-being and prospects, as specified herein.

93.    Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Dentsply's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Dentsply and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

94.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

95.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Dentsply's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

96.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Dentsply's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Dentsply's common stock during the Class Period at artificially high prices and were damaged thereby.

97.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff

and the other members of the Class and the marketplace known the truth regarding the problems that Dentsply was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Dentsply common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

98.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

99.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

100.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

101.    Individual Defendants acted as controlling persons of Dentsply within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements

alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

102.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

103.    As set forth above, Dentsply and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  December 18, 2024                     **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                              */s/ Thomas L. Laughlin, IV*
                                              Thomas L. Laughlin, IV (TL-8888)
                                              Nicholas S. Bruno (NB-5953245)
                                              Matthew A. Peller (MP-2420)
                                              The Helmsley Building
                                              230 Park Avenue, 24th Floor
                                              New York, NY 10169
                                              Telephone: (212) 223-6444
                                              Facsimile:  (212) 223-6334
                                              tlaughlin@scott-scott.com
                                              nbruno@scott-scott.com
                                              mpeller@scott-scott.com

                                              *Counsel for Plaintiff Richard Clavin*


                                              Brian J. Schall
                                              **THE SCHALL LAW FIRM**
                                              2049 Century Park East, Suite 2460
                                              Los Angeles, CA 90067
                                              Tel:  310-301-3335
                                              Fax: 310-388-0192
                                              brian@scott-scott.com

                                              *Additional Counsel for Plaintiff Richard Calvin*

**CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS**

1.      I, Dr. Richard Calvin, make this declaration pursuant to §27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or §21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a complaint against Dentsply Sirona Inc. ("Dentsply" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Dentsply securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Dentsply securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet (Schedule "A") lists all of my transactions in Dentsply securities during the Class Period, as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct this day of 12/13/2024 .

Signed by:

*Richard Calvin*

4FAA9A92FE124E5...

Dr. Richard Calvin

# Schedule A

**DENTSPLY SIRONA INC**                          **Ticker:**    **XRAY**    **Cusip:**    **24906P109**

Class Period: 02/28/2022 to 11/06/2024

**RICHARD CALVIN**                               **DATE**    **SHARES**    **PRICE**

                                  **Purchases:**    3/7/2022    100    $51.00